UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

HOWARD G. DOYLE, JR.,          )
                              )
        Plaintiff,            )
                              )
v.                            )          Case No. 5:16-cv-24
                              )
NANCY A. BERRYHILL, Acting    )
Commissioner of Social Security,[1]  )
                              )
        Defendant.            )

### OPINION AND ORDER
### (Docs. 12, 15, 17)

Plaintiff Howard G. Doyle, Jr. brings this action under 42 U.S.C. § 405(g), requesting

reversal of the decision of the Commissioner of Social Security denying his applications for

supplemental security income ("SSI") and disability insurance benefits ("DIB"). Pending before

the court is Mr. Doyle's motion to reverse the ruling of the Commissioner (Doc. 12) and the

Commissioner's motion to affirm (Doc. 15). Also pending is Mr. Doyle's motion to modify the

complaint (Doc. 17). For the reasons stated below the court GRANTS Mr. Doyle's motion to

reverse, DENIES the Commissioner's motion to affirm, and REMANDS for a new decision.

The court also DENIES Mr. Doyle's motion to modify his complaint.

### Background

Mr. Doyle was 30 years old on his alleged disability onset date of September 1, 2011. He

has an eleventh-grade education. (AR 98.) Mr. Doyle applied for SSI and DIB on May 14,

2012, alleging a disability onset date of September 1, 2011. (AR 23.) The claims were denied

initially on September 11, 2012, and on reconsideration on November 13, 2012. (AR 23, 194,

---

[1] The court has amended the caption to reflect the current Acting Commissioner of Social Security, who assumed office on January 20, 2017. *See* Fed. R. Civ. P. 25(d).

211.)  He had a hearing before the Administrative Law Judge ("ALJ") Paul Martin on July 10, 2014.  (AR 93–136.)

At the hearing, Mr. Doyle testified that he had been in two serious car accidents. (AR 102.)  The first accident, in 2000, resulted in the death of Mr. Doyle's brother, and Mr. Doyle himself suffered a severe traumatic brain injury along with other significant injuries. (AR 104.)  He spent several years recovering from this accident, and began working as a driver of a garbage truck beginning in 2005.  (AR 102, 118.)  In September 2011, he was in another car accident.  (AR 104, 748.)  A few months after the second car accident, in November 2011, he fell down the stairs after he became dizzy and his knees buckled—"feel[ing] like jelly"— again hitting his head.  (AR 104–05.)  Prior to the 2000 accident, Mr. Doyle worked as a laborer at an auto parts store, a gas pump attendant and a prep cook in a bakery.  (AR 118.)  He stated that he had not looked for work since the September 2011 accident because working "would just be impossible to do."  (AR 102.)

Mr. Doyle stated that he currently lives in a small house with his girlfriend and her two children.  (AR 99–100.)  He has three children of his own that he sees regularly, but that do not live with him.  (AR 99.)

Mr. Doyle testified to quite limited daily activities.  He stated that he generally sleeps terribly, and that when he wakes up, his back, legs, and hips are "tingly," and his feet are numb. (AR 106.)  He tries to walk back and forth in the driveway to get himself motivated in the morning, but does not do much more than that.  (*Id.*)  He said that he does not do many chores and that his girlfriend tends to do them.  (*Id.*)  He frequently takes a nap during the day because he sleeps so poorly at night, but he is "very uncomfortable" no matter what position he is in.

(AR 107.) With his girlfriend, he occasionally goes to the store or to pick up her children. (AR 107–08.)

Mr. Doyle also stated that he has significant and constant physical pain throughout his body. He said his back constantly hurts, from the bottom of his shoulder blades down to his hips and buttocks. (AR 109.) The pain also radiates down his legs, into his knees, calves, and ankles. (*Id.*) His feet are "numb and tingly," and become more so when he is sitting. (*Id.*) He also has pain in his forearms and fingers, which also are "numb and tingly," and that some doctors have said he has carpal tunnel syndrome. (AR 111.) At the administrative hearing he was wearing braces on his wrists, which he said had been prescribed for him. (AR 110–12.) His girlfriend drove him to the hearing and on the way they had to stop twice because his feet went numb and tingled. (AR 117.)

During the hearing, he constantly switched positions because of the pain and numbness in his hips, legs and feet. (AR 117.) He said that he had a hard time picking things up because of pain and numbness in his fingers, arms, and legs. (AR 119.) Small objects in particular are hard for him because he either drops them or squeezes them too hard. (AR 121.) He frequently puts holes in Styrofoam coffee cups because he grips them too tightly and cannot do dishes because he will drop them. (AR 122, 125.) He testified that he cannot reach his arms above his shoulders because of pain and that he cannot do repetitive activities with his hands because they will go numb or become tingly and he will drop things. (AR 122.) He testified that he thought he could lift five or ten pounds repeatedly and that he could stay standing in one spot for five minutes before he would need to change position. (AR 122–23.) He also testified to numbness and pins and needles in his hips when he walks and that he has pain in his hips when he bends. (AR 123.) He testified that he leaves his shoes untied. (*Id.*)

Mr. Doyle testified to frequent headaches and dizzy spells. He said he experiences daily headaches since he fell down the stairs in 2011. (AR 112–13.) He said that they can be "pretty bad," and are more frequent at night and when he wakes up and can be exacerbated by stress. (AR 113–14.) He said in the last month, he had had 10 to 15 headaches during the day and 30 headaches at night. (AR 115.) He typically treats his headaches with ibuprofen and by lying in a dark room with a pillow over his head. (*Id.*) He gets dizzy spells every day, frequently from the transition from sitting to standing or vice versa. (AR 121.) He relieves the dizziness by standing still and waiting for it to pass.

Mr. Doyle also testified to significant mental limitations, especially memory and concentration. He said that he frequently has trouble "figuring out what word to use" and that he feels his memory problems are getting worse. (AR 102–03.) When he enters a store, he will forget what he wanted to buy, and when he puts down a drink, he will forget where he put it. (AR 103.) Mr. Doyle said that others had told him that he had a tendency in conversation to "wander off into another totally different subject." (*Id.*) He said that concentrating was stressful regardless of whether he was working on something simple or something with multiple steps. (*Id.*) Because of his trouble with concentration, he cannot sit through a 30-minute television show and understand it from start to finish, nor can he read a book through. (AR 105–06.) His girlfriend maintains his schedule for medical appointments. (AR 108–09.)

He stated that he has trouble driving, including sitting and using his shoulders, but especially with concentration and following signs. (AR 100.) He said that he frequently gets lost while driving and is not comfortable driving outside of his community. (*Id.*) He said that he mostly drives to either his mother's house or his father's house, both of which are nearby.

(AR 100.) He testified that, even before his 2011 accident, he would have trouble remembering new additions to his route as a garbage truck driver. (AR 118.)

He testified that he has suicidal thoughts and that those become worse when people say bad things about him, or pick on him, which they frequently do because they mistake his limitations caused by his traumatic brain injuries for stupidity. (AR 113–14, 120.) He also testified that he has a hard time dealing with a high volume of noise and that he "just lose[s] it" under such conditions. (AR 124.)

The ALJ issued a decision finding that Mr. Doyle was not disabled on September 19, 2014. (AR 23–36.) The Appeals Council denied his request for review on December 24, 2015. (AR 1–4.) Mr. Doyle's filed this lawsuit on January 29, 2016. (Doc. 1.)

### ALJ Decision and Appeals Council Denial

The ALJ is required to follow the five-step process in determining a claimant's disability. *Machia v. Astrue*, 670 F. Supp. 2d 326, 333 (D. Vt. 2009) (internal citation omitted); *see* 20 C.F.R. §§ 404.1520, 416.920. The answer at each step determines if the next step must be addressed. *Machia*, 670 F. Supp. 2d at 330. At the first step the ALJ determines if the claimant has engaged in Substantial Gainful Activity since the alleged onset date of his disability. *Id.* If the answer is no, step two then asks if the claimant has any "impairments" that are "severe." *Id.*

If there is one or more severe impairment, step three evaluates whether any of these impairments meet the listed impairments in Appendix 1 of the regulations; if an impairment meets the listing the claimant is deemed disabled. If it does not, step four asks whether the claimant retains the residual functional capacity ("RFC") to do his past relevant work. *Id.* If the claimant can no longer do his past relevant work, step five asks whether the claimant is able to do any job available in significant numbers in the national economy. *Id.* "The claimant bears the burden of proving his case at steps one through four, . . . and at step five, there is a 'limited

burden shift to the Commissioner' to 'show that there is work in the national economy that the claimant can do.'" *Larkin v. Comm'r of Soc. Sec.*, No. 2:10-CV-291, 2011 WL 4499296, at \*2 (D. Vt. Sept. 27, 2011) (quoting *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)).

The ALJ found at step one that Mr. Doyle had not engaged in substantial gainful activity since his alleged onset date, September 1, 2011. (AR 25.) At step two, the ALJ found that Mr. Doyle had four severe impairments: "a traumatic brain injury with reported cognitive or memory problems and headaches, 'all-over body pain,' carpal tunnel syndrome, and an affective disorder." (AR 25–26.) At step three, the ALJ determined that Mr. Doyle did not have an impairment that met or medically equaled a listed impairment. (AR 26–27.) The ALJ determined that Mr. Doyle had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c), but could "only occasionally engage in fine manipulation," and "would need to avoid ambient noise that was prolonged and excessively loud," and was limited to "simple repetitive tasks with one to three step instructions." (AR 27–34.) At step four, the ALJ determined that that Mr. Doyle could not perform any of his past relevant work. (AR 35.) At step five, the ALJ concluded that there were other jobs available in the national economy which Mr. Doyle could perform, including dietary aide, kitchen helper, and gate attendant. (AR 35–36.) The ALJ concluded that Mr. Doyle was not under a disability, as defined in the Social Security Act, from the alleged onset date of September 1, 2011 through the date of decision, September 19, 2014. (AR 35.)

On appeal, Mr. Doyle submitted additional medical records concerning his treatment in the months between his hearing and the ALJ's decision, and his treatment after the ALJ's decision. (AR 8–19, 45–92.) The Appeals Council concluded that the evidence of his treatment before the ALJ's decision did not change the outcome of the decision, as required under

20 C.F.R. § 405.401(c) (2016)[2] for consideration. (AR 2.) It concluded that the medical records concerning the time after the ALJ's decision was "about a later time" and therefore did not affect whether he was disabled on or before the date of the ALJ's decision. (*Id.*) The Appeals Council then denied review. (AR 1.)

## Standard of Review

Disability is defined by the Social Security Act in pertinent part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

When considering the ALJ's disability decision, the court "review[s] the administrative record de novo to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The decision is subject to a factual review determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to

---

[2] This provision has been updated and moved and can now be found at 20 C.F.R. §§ 404.970, 416.1470. *See* Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process, 81 Fed. Reg. 90987 (Dec. 16, 2016).

be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. The court is mindful that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981); *see also, e.g., Johnson v. Comm'r of Soc. Sec.*, No. 2:13-CV-217, 2014 WL 2118444, at *3 (D. Vt. May 21, 2014).

## Analysis

Mr. Doyle challenges several aspects of the ALJ's decision and the denial of review by the Appeals Council. He contends that the ALJ improperly weighted the opinions of some of the doctors who examined or treated him, that the ALJ's hypothetical posed to the vocational expert did not properly incorporate the limitations proposed by the doctor the ALJ afforded more weight to, and that the Appeals Council should have considered new evidence he submitted after the ALJ's decision. He also asserts, in a separate motion, that the court should limit the scope of any remand in light of his subsequent successful application for disability benefits.

## I. Opinion Evidence

The weight to be accorded a medical opinion depends on several factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is of a specialist; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); *see also Wolfe v. Comm'r of Soc. Sec.*, 272 F. App'x 21, 23 (2d Cir. 2008).[3]

---

[3] The court applies the regulations in effect at the time Mr. Doyle's application was submitted. The regulations regarding evaluation of medical evidence have recently changed for claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

The opinions of treating physicians are generally given "a measure of deference" by the ALJ. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Where a treating physician's opinion is not given controlling weight, the ALJ should determine the appropriate weight to be accorded by reference to the same factors discussed above. 20 C.F.R. §§ 404.1527(c), 416.927(c). The Commissioner is required to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

### A.      Dr. Lantrip and Dr. Flashman

Dr. Crystal Lantrip and Dr. Laura Flashman, neuropsychologists, conducted a neuropsychological evaluation of Mr. Doyle on May 15, 2014. (AR 913.) They took a brief history, observed his behavior, and conducted a battery of neuropsychological tests. (AR 913–16.)

In observing Mr. Doyle's behavior, they noted normal gait and gross motor movements, difficulties with fine motor control, rigid posture due to back pain, and that he occasionally had to change position because of it. (AR 914.) He reported having pain that was an 8 out of 10, but was "generally cooperative, appeared motivated, and performed with expectation on performance validity tests." (AR 914.) The doctors concluded that "the present test results are considered to be an accurate estimate [of] his current level of cognitive functioning." (AR 914.)

On self-reported "mood screening measures," Mr. Doyle's responses suggested severe depression, mild current anxiety, and severe longstanding anxiety. (AR 916.) The doctors noted that "affective distress is likely impacting on his current cognitive abilities to some degree." (AR 916.)

On the neuropsychological tests, Mr. Doyle's scores were generally in the low average to average ranges. (AR 914–15.) On memory tests, he had several scores that were "borderline" or

below, including several where he tested as "moderately-severely impaired." (AR 915.) He also

scored as severely and mildly impaired on two tests measuring sensory-motor functioning.

(AR 916.)

The doctors summarized the test results: Mr. Doyle had low average to average

intellectual functioning, low average to average attention and executive function, average

visuospatial skills, and average language skills. (AR 916–17.) They found two primary areas of

impairment: memory impairments—including "impaired encoding, consolidation, and retrieval

of visual information, with impaired retrieval and recognition of rote verbal information"—and

sensory-motor skill impairment—he tested as "severely impaired" with both hands on the

grooved pegboard test and "mildly impaired" on the thumb-finger sequencing test. (AR 916–

17.)

The doctors concluded that the evidence indicated "frontal-subcortical dysfunction" and

"evidence of weaker left than right hemisphere function." (AR 917.) They noted that "[t]he

etiology of Mr. Doyle's current cognitive deficits is likely multi-factorial . . . with contributions

from his traumatic brain injury in 2000, history of additional falls and head injuries, pain, and his

current significant affective distress." (AR 918.) They recommended neuroimaging, alternative

pain management options, cognitive behavioral therapy, physical therapy, occupational therapy,

that he learn "to approach tasks and new learning in an organized manner" to improve his

memory, to use a calendar to "facilitate memory for appointments," participation in a brain

injury support group, and a neuropsychological reevaluation in 18 to 24 months. (*Id.*)

The ALJ afforded the opinion of Dr. Lantrip and Dr. Flashman "lesser weight." (AR 31.)

He offered two reasons in support. "First, and most persuasively, [the doctors] failed to provide a

function-by-function assessment of the maximum the claimant can do in spite of his alleged

impairments," but instead "provided vague statements that his limitations are multi-factor[i]al in nature." (AR 32.) Second, the ALJ discounted the value of the medical opinion because, as the doctors noted, the tests had been conducted "in the context of severe self-reported symptoms of depression and anxiety" and because Mr. Doyle had told the doctors that he had had to leave his job because of cognitive difficulties. (AR 32.) The ALJ noted that these "factors are frankly suspect in light of the evidence as a whole, including Dr. Roomet's assessment above and the complete lack of mental health treatment or counseling." (AR 32.)

Mr. Doyle argues that the ALJ's decision to accord lesser weight to the opinion of Dr. Lantrip and Dr. Flashman is unsupported by substantial evidence. First, he contends that it was improper to rely on the absence of a "function-by-function assessment" as a basis for discounting the doctors' report, especially when the ALJ did not also discount Dr. Roomet's opinion on Mr. Doyle's mental residual functional capacity for the same omission. (Doc. 12-1 at 17.)

The court agrees. The ALJ stated that the "most persuasive[]" reason for discounting the opinion of Dr. Lantrip and Dr. Flashman was that "they failed to provide a function-by-function assessment of the maximum [Mr. Doyle] could do in spite of his alleged impairments," but instead "provided vague statements that his limitations are multi-factor[i]al in nature." (AR 32.) This reason is not supported by either the facts or the law.

First, a failure to provide a "function-by-function assessment" is not a basis for discounting a medical opinion. As summarized above, 20 C.F.R. §§ 404.1527(c), 416.927(c) provide several factors for ALJs to consider in weighing medical opinions: the examining relationship between the claimant and the medical source, the treatment relationship, the length of treatment or frequency of examination, the nature and extent of the treatment relationship, the

supportability of the opinion with medical evidence in the record, the consistency of the opinion

with the record as a whole, whether the medical source is a specialist. Whether a medical

opinion includes a "function-by-function assessment" is not a factor.[4] It is true that the

regulation includes a catchall for "other factors" "which tend to support or contradict the medical

opinion," 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6), but it is hard to see how a doctor's failure

to formulate her opinion as a function-by-function assessment is indicative of the reliability of

that opinion. Doctors author opinions about their patients' health for all manner of purposes and

under all manner of circumstances; they do not always write such opinions with an eye toward

their patients' pending disability claims. The regulations accommodate this fact by defining

"medical opinions" broadly—as "statements from acceptable medical sources that reflect

judgments about the nature and severity of your impairment(s), including your symptoms,

diagnosis and prognosis, what you can still do despite impairment(s), and your physical or

mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). So long as a medical source's

---

[4] *See, e.g., Diaz v. Berryhill*, No. 15 C 11386, 2017 WL 497768, at *4 (N.D. Ill. Feb. 7, 2017) ("[T]he Social Security regulations do not require a function-by-function analysis."); *Stango v. Colvin*, No. 3:14-cv-01007, 2016 WL 3369612, at *11 (D. Conn. June 17, 2016) (noting that there is "no authority that determines that a treating physician's opinion should be cast aside where it does not include a 'function-by-function assessment of the claimant's capabilities,'" especially because, under Second Circuit law, not even the ALJ has an "obligation in every instance to perform a function-by-function analysis"); *Rodriguez v. Colvin*, No. 15 Civ. 297, 2016 WL 1573464, at *13 (S.D.N.Y. Apr. 18, 2016) ("Whether the treating physician conducted a function-by-function analysis is not a factor under 20 C.F.R. § 404.1527(c)."); *Chavez v. Soc. Sec. Admin.*, No. CV-14-02654, 2016 WL 1104624, at *5 (D. Ariz. Mar. 22, 2016) (noting that failure to include a "function-by-function analysis" is "not a specific or legitimate reason for discounting" a doctor's opinion—instead, "ALJ must consider the doctor's clinical evidence and any work related limitations suggested by that evidence"); *Rivers v. Astrue*, No. 1:08-CV-1824, 2009 WL 1160259, at *15 (N.D. Ill. Apr. 29, 2009) ("[W]e agree that [SSR 96–2(P)] does not require a treating physician's medical opinion to contain a detailed function-by-function RFC in order to be given controlling weight."). *But see, e.g., Arthur v. Colvin*, No. 3:16CV00765, 2017 WL 816995, at *11 (N.D. Ohio Jan. 18, 2017) (approving of ALJ's determination to discount medical opinion for lack of a function-by-function assessment); *Herriage v. Colvin*, No. 14-1345, 2015 WL 5472496, at *4 (D. Kan. Sept. 16, 2015) (same).

opinion meets this definition, the ALJ must consider the appropriate factors to determine the weight accorded to that opinion.

Second, a close look at the opinion of Dr. Lantrip and Dr. Flashman reveals that it *does include* a function-by-function assessment of Mr. Doyle's impairments—just not in the form of a typical RFC determination as apparently expected by the ALJ. The battery of tests conducted by the doctors specifically evaluated Mr. Doyle's general intellectual functioning, his memory (broken down into logical memory, visuospatial memory, and verbal learning), his attention and executive functioning, his language skills, and his sensory-motor functioning. (AR 915–16.) In reviewing the results of these tests, the doctors stated his abilities and specific impairments across all of these categories. (AR 916–17.)

Third, the doctors did not "provide vague statements that his limitations are multi-factor[i]al in nature," as the ALJ stated. (AR 32.) The opinion instead states that "[t]he *etiology* of Mr. Doyle's current cognitive deficits is likely multi-factorial," and then, as already noted, provides detailed analysis of Mr. Doyle's neurological abilities. (AR 917–18 (emphasis added).)

Because the ALJ characterized this as the "most persuasive" reason for discounting the opinion of Dr. Lantrip and Dr. Flashman, the ALJ's decision cannot be saved by other reasons supporting the lesser weight accorded the doctors' opinion. *See Johnson v. Colvin*, No. 15-CV-6078P, 2016 WL 3922025, at *5 (W.D.N.Y. July 21, 2016) (collecting cases concluding that other good reasons cannot save an ALJ's weighing of evidence when the primary reason relied on by the ALJ is incorrect). The case must be remanded for a determination of the appropriate weight accorded to the opinion of Dr. Lantrip and Dr. Flashman.

The court comments briefly on Mr. Doyle's other arguments concerning the opinion of Dr. Lantrip and Dr. Flashman. Mr. Doyle contends that it was inappropriate to weigh the

opinion of Dr. Roomet more heavily than that of Dr. Lantrip and Dr. Flashman because

Dr. Roomet explicitly stated that he could not determine Mr. Doyle's cognitive impairments

without neuropsychometric testing—the very tests that Dr. Lantrip and Dr. Flashman conducted.

(Doc. 12-1 at 17.)  The court agrees.  Dr. Roomet recognized that his belief that Mr. Doyle did

not have cognitive impairments was a guess based on limited information—he noted that

"[w]ithout the benefit of formal neuropsychometric testing, it is not possible for me to say

whether there are some cognitive impairments." (AR 872.)  A month later, Dr. Lantrip and

Dr. Flashman conducted that testing and found that Mr. Doyle suffered cognitive impairments.

An ALJ cannot credit the acknowledged guess of one doctor over the opinion of other doctors

supported by objective evidence.

Mr. Doyle also contends that the ALJ was wrong to discount the doctors' opinion

because the tests were conducted at a time when Mr. Doyle self-reported severe depression.  He

points out that Dr. Lantrip and Dr. Flashman did not find this self-report inconsistent with their

objective findings.  (Doc. 12-1 at 17.)  On remand, the ALJ should take a second look at this

issue.  It is true, as the ALJ noted, that the doctors commented that Mr. Doyle's current

"affective distress is likely impacting on his current cognitive abilities to some degree." (AR

916.)  But, at the same time, the doctors noted that Mr. Doyle "performed within expectation on

performance validity tests" and therefore they concluded that the "present test results" were "an

accurate estimate [of] his current level of cognitive functioning." (AR 915.)

Finally, Mr. Doyle contends that the ALJ wrongly concluded that the record

demonstrated a "complete lack of mental health treatment or counseling" that would be

consistent with the doctors' findings.  (AR 32; Doc. 12-1 at 17.)  He points to evidence that his

treating physician, Dr. Lazar, began treating his depression with Cymbalta in December 2013

and that he began therapy with a social worker in April 2014. (Doc. 12-1 at 17; AR 690, 907.)

The court concludes that the ALJ's reading of the record regarding Mr. Doyle's mental

health treatment is supported by substantial evidence. The ALJ did note that Dr. Lazar treated

Mr. Doyle's depression with Cymbalta, and generally noted that Mr. Doyle reported depression

at his doctor's appointments. (AR 31.) And the other evidence Mr. Doyle points to does not

show that he began seeing a social worker in April 2014, instead it shows that Dr. Lazar

recommended that he do so. (AR 907.) It does, however, appear that Mr. Doyle did have at least

a few therapy sessions in spring 2014, because in June, a social worker noted that it was

Mr. Doyle's last session with her. (AR 928.) Nonetheless, this does not show that the ALJ's

characterization of Mr. Doyle's mental health treatment is unsupported by substantial evidence.[5]

## B.     Dr. Roomet

Dr. Roomet, a neurologist, conducted a consultative exam of Mr. Doyle on April 8, 2014.

(AR 870.) After taking Mr. Doyle's history, Dr. Roomet conducted a physical examination.

(AR 871.) He stated that Mr. Doyle appeared "slightly anxious," but that his interpersonal

interactions were fine and he did not display "any thought disorder or gross mental dysfunction."

(*Id.*) He noted nothing unusual about his gait except that it was slow, that he had a full range of

motion in his upper extremities and "adequate agility for fine tasks." (*Id.*) Mr. Doyle had a

"vague subjective sensory decrease" from his wrists to his fingers. (*Id.*) He also had a full range

---

[5] The court notes a slightly different problem. While Mr. Doyle did suffer depression and anxiety for which mental health care or therapy might be helpful, it is not clear how the lack of mental health care is a reason to doubt the cognitive impairments identified by Dr. Lantrip and Dr. Flashman. *See McGee v. Astrue*, No. CV 08-5628, 2009 WL 3770669, at *6 (C.D. Cal. Nov. 9, 2009) (concluding that "lack of mental health treatment" was not a "legitimate basis" for doubting claimant's testimony that he had a cognitive deficit—specifically that he had a low IQ).

of motion and no local tenderness in his back, and that he had full range of motion with his hips, knees, and ankles without decreased strength or sensation. (*Id.*)

Dr. Roomet assessed that Mr. Doyle had "subjective memory loss and attention span following the 2000 accident." (AR 872.) But he noted that Mr. Doyle was able to go back to work after that accident and that "there was no additional head injury with the 2011 accident." (*Id.*) He concluded that he could not determine whether Mr. Doyle had cognitive impairments without "formal neuropsychometric testing," but that if there were such impairments "they certainly would seem not to be so severe as to preclude manual types of work" that Mr. Doyle had done previously. (*Id.*) Dr. Roomet found "no objective [physical] impairment" and that Mr. Doyle's "subjective allegations of back pain, arthritis, knee pains, shoulder pains, [and] ankle pains . . . had [no] objective quantification." (*Id.*) He concluded that "very heavy work" would be difficult for him, but other work "would seem to be possible." (*Id.*)

Dr. Roomet also completed a separate form opining on Mr. Doyle's physical work-related limitations. (AR 873–78.) He limited Mr. Doyle to occasionally lifting and carrying 21 to 50 pounds and frequently carrying 11 to 20 pounds and sitting for 6 hours, standing for 4 hours, and walking for 6 hours in an 8-hour day. (AR 873–74.) He could continuously reach, handle, finger, feel, push, and pull with both hands and could frequently climb stairs, ramps, ladders and scaffolds, balance, stoop, kneel, crouch and crawl. (AR 876.) He limited him to never be exposed to unprotected heights or very loud noises. (AR 877.)

The ALJ "afford[ed] some weight" to Dr. Roomet's opinion regarding Mr. Doyle's neurological impairments and afforded significant weight to the doctor's opinion regarding Mr. Doyle's "alleged physical impairments." (AR 31–32.) He noted that the limitations

Dr. Roomet recommended were "fully consistent" with the residual functional capacity he had determined. (AR 32.)

Mr. Doyle argues that the ALJ erred by according "some weight" to Dr. Roomet's opinion regarding his mental impairments and "substantial weight" to the doctor's opinion regarding his physical impairments. (Doc. 12-1 at 9–13.) He offers several reasons why Dr. Roomet's opinions should be accorded less weight.

First, he asserts that Dr. Roomet's opinion does not take into account evidence related to the incident in November 2011 when Mr. Doyle's fall down a flight of stairs, including that he suffered post-concussion syndrome, migraines, and other symptoms. (Doc. 12-1 at 10.)

The court agrees. Mr. Doyle did tell Dr. Roomet about the car accident in September 2011, but Dr. Roomet noted that this accident did not result in additional brain injury. (AR 870.) But it does not appear that the doctor knew about Mr. Doyle's subsequent fall in November 2011. (*Id.*) Instead, Dr. Roomet noted that, after the 2011 car accident, Mr. Doyle returned to work and was placed on light duty, but that he had to stop working because, if he "sat for any length of time," his knees would "give out," and he would have trouble working. (*Id.*) In his assessment, in support of Dr. Roomet wrote that "it is important to note that [Mr. Doyle] was able to go back to his usual job after [the 2000 car accident], and there was no additional head injury with the 2011 [car] accident." (AR 872.)[6]

According to a history taken by another doctor, seven days after the fall down the stairs, Mr. Doyle reported that he "fell twelve steps hitting his head and neck suffering increased

---

[6] The court notes that it does not appear that the ALJ considered the 2011 fall down the stairs either. The ALJ relied on Dr. Roomet's statement that Mr. Doyle stopped working after the car accident in 2011 because his knees would give out if he sat for too long. (AR 30.) The ALJ also noted that a worker's compensation physician cleared Mr. Doyle to return to work in January 2012, but did not note that a month later, a neurologist stated that he was "[o]ff work until further notice." (AR 726.)

17

headache and neck pain, dizziness." (AR 844.) He reported that, after the accident, he had "ongoing dizziness, blurring of vision in both eyes, difficulty with attention and concentration, [and] problems with recent memory." (*Id.*)

Second, he contends that it is inappropriate to accord more weight to Dr. Roomet's opinion than to Dr. Lantrip and Dr. Flashman's opinion regarding his cognitive impairments because Dr. Roomet lacked any objective data in making his opinion. (Doc. 12-1 at 10–11.) The court agrees. As already discussed, Dr. Roomet's guess that Mr. Doyle did not have any cognitive impairments cannot be credited over the opinion of Dr. Lantrip and Dr. Flashman, which is supported by objective testing.

Third, he argues that Dr. Roomet's conclusion that he "really has no objective [physical] impairment" is contradicted by objective medical evidence in the record, including MRIs, EMG and NCV studies, and Mr. Doyle's repeated physical therapy treatments. (Doc. 12-1 at 12.) Because the case must be remanded for a reevaluation of the weight accorded Dr. Roomet for the reasons already articulated, the court will not address this argument in full. It notes that, at the very least, the ALJ should reconsider reliance on this conclusion in light of its reevaluation of the opinion of Dr. Lantrip and Dr. Flashman, whose testing suggested that Mr. Doyle suffered significant fine-motor impairments. On remand, the ALJ should consider whether the objective medical evidence pointed to by Mr. Doyle supports or contradicts Dr. Roomet's conclusion that Mr. Doyle lacks an objective physical impairment.

### C.    Dr. Lazar

Mr. Doyle also challenges the weight accorded the opinion of Dr. Lazar, his treating physician. (Doc. 12-1 at 14–16.) Dr. Lazar authored a medical source statement suggesting physical work limitations for Mr. Doyle (AR 827–32) and a similar statement identifying mental limitations (AR 835–37).

The ALJ accorded only "limited weight" to the opinions of Dr. Lazar because he found that her opinions lacked a "basis" and "objective measures" for the proposed limitations, because she is not a specialist, and because she had only been Mr. Doyle's treating physician for a relatively limited period of time. (AR 33.) The ALJ also noted that her own treatment notes "include limited objective medical signs and limited and generally unremarkable objective examinations," and that the doctor had "likely based her findings [] on the claimant's subjective self-reports, rather than any objective findings." (*Id.*) The ALJ also appeared to discount Dr. Lazar's opinion for any agreement it might have with the opinion of Dr. Lantrip and Dr. Flashman, which the ALJ had already discounted for the reasons described above. (*Id.*)

Because the ALJ must reevaluate the weight accorded the opinion of Dr. Lantrip and Dr. Flashman, the ALJ should also reevaluate the weight accorded to the opinion of Dr. Lazar, which the ALJ discounted in light of his evaluation of the opinion of Dr. Lantrip and Dr. Flashman. Because the case must be remanded and because Dr. Lazar's opinion must be reevaluated on this ground, the court will not address the other arguments raised by Mr. Doyle on this issue.

## II.    Testimony of the Vocational Expert

Mr. Doyle also challenges the ALJ's reliance on the testimony of the vocational expert. (Doc. 12-1 at 20–21.)

At the hearing, the ALJ asked the vocational expert what positions were available for a person who could perform medium work, but limited to only occasional fine manipulation and to simple, repetitive tasks with three-step instructions, and who could not tolerate prolonged and excessively loud noise. (AR 127–28.) The expert responded that a person with those limitations could work as a dietary aide, a kitchen helper, or a gate attendant. (AR 128.)

Mr. Doyle argues that the ALJ's hypothetical did not properly consider the limitations on sitting, standing, and walking noted by Dr. Roomet, whose opinion the ALJ afforded significant weight. Dr. Roomet marked that Mr. Doyle was limited to sitting for four hours without interruption for total of six hours of an eight-hour work day, standing for three hours for a total of four hours, and walking for four hours for a total of six hours.

The court disagrees. By limiting the hypothetical to medium work, the ALJ had incorporated Dr. Roomet's limitations. Under SSR 83-10, "medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday," during which "[s]itting may occur intermittently." Dr. Roomet's limitation of four hours of standing *and* six hours of walking meets the exertional limitations for medium work.

The court notes that, on remand, reliance on this hypothetical may no longer be appropriate, depending on the reevaluation of the weight accorded to Dr. Roomet.

## III.    New Evidence Submitted to the Appeals Council

Mr. Doyle also argues that the Appeals Council erred by not considering additional evidence that he submitted after the ALJ's decision. (Doc. 12-1 at 18–20.) The evidence submitted consists of medical records from the time period between the hearing on July 10, 2014, and the ALJ's decision on September 19, 2014 (AR 45–92), and medical records from after the ALJ's decision (AR 8–19). Because the case must be remanded for a reevaluation of the weight accorded to medical opinions in the case, the ALJ should consider any of the evidence submitted that he considers material to Mr. Doyle's claim for disability. *Thompson v. Astrue*, 583 F. Supp. 2d 472, 476 (S.D.N.Y. 2008) ("Case law recognizes that, in the absence of limiting instructions or court findings, the Commissioner may revisit on remand any issues relating to the application for disability benefits.")

## IV.     Motion to Modify Complaint

After briefing on the merits was complete, Mr. Doyle submitted a motion to modify his complaint.  (Doc. 17.)  He informs the court that he had submitted a subsequent application for disability benefits, and on September 14, 2016, the Social Security Administration found him disabled as of September 20, 2014, the day after the ALJ in this case found him not disabled.  (Doc. 17 at 1.)  He requests that his complaint be modified to provide that, if the case is remanded, the inquiry on remand will be limited to the period from September 22, 2011 (his alleged onset date) to September 19, 2014.

The Commissioner opposes this motion.  She argues that the court lacks jurisdiction to limit the scope of the remand in the manner requested because it would in effect be an order directing the Commissioner not to reopen Mr. Doyle's subsequent affirmative disability determination—a determination which is not before the court.  (Doc. 18.)

The Commissioner argues that no "final decision" has been reached in Mr. Doyle's subsequent application for disability benefits because a favorable determination was made, and so no appealable, final decision has been reached.  (Doc. 18 at 5.)  Furthermore, the Commissioner points out that she has the right to reopen a determination (whether favorable or unfavorable) within 12 months of the original determination for any reason.  20 C.F.R. §§ 404.988(a), 416.1488(a).  Accordingly, the Commissioner contends that Mr. Doyle's motion is an attempt to "preemptively [] bar the Commissioner from reopening the subsequent favorable determination" and therefore a request that the court rule on the merits of the subsequent determination, something which it lacks jurisdiction to do.  (Doc. 18 at 5.)

Generally, courts have jurisdiction to review only a "final decision" of the Commissioner regarding Social Security benefit determinations.  *See* 42 U.S.C. § 405(g)–(h); *Iwachiw v. Massanari*, 125 F. App'x 330, 331 (2d Cir. 2005).  "The Commissioner's decision does not

become 'final' until after the Appeals Council has denied review or decided the case after review." *Iwachiw*, 125 F. App'x at 331 (internal quotation marks omitted).

The court is not convinced that limiting the period of disability on remand in *this* appeal would, as the Commissioner contends, preclude her from reopening Mr. Doyle's subsequent disability determination if she thought it appropriate. After all, the court can only exercise authority over the final decision which was appealed to it, and limiting the scope of the remand in this case to whether Mr. Doyle was disabled between September 22, 2011 and September 19, 2014 should not affect the Commissioner's authority to reopen a different disability determination made on a different disability application. Mr. Doyle has not expressly requested that the court's remand order preclude the Commissioner from reopening the later disability determination. But if he had, the court agrees with the Commissioner that it would lack jurisdiction to issue an order to that effect.

This was the conclusion reached by the Southern District of Indiana under similar circumstances. In that case, the plaintiff requested that the remand to the ALJ be limited "in such a way as to prevent the ALJ from touching the favorable Second Application." *Fields v. Astrue*, No. 1:09-cv-259, 2009 WL 5217090, at *1 (S.D. Ind. Dec. 30, 2009) (internal quotation marks and alterations omitted). The court concluded that it lacked the authority to do so, noting that the "only final decision before the Court is the ALJ's denial of the First Application. Thus, the Court cannot order the ALJ to do anything regarding the Second Application because it is not before the Court." *Id.* (footnote omitted).

But even assuming that the court could limit the scope of remand in this case without affecting the Commissioner's authority to reopen the second, favorable determination, the court

will not do so.  Mr. Doyle has not provided any legally justifiable reason for limiting the remand as he requests.  Accordingly, the court will deny the motion to modify the complaint.

## Conclusion

For the reasons stated above, Mr. Doyle's Motion for Order Reversing the Decision of the Commissioner (Doc. 12) is GRANTED, the Commissioner's Motion for Order Affirming the Decision (Doc. 15) is DENIED, and the matter is REMANDED for further proceedings and a new decision in accordance with this ruling.  Mr. Doyle's Motion to Modify Complaint (Doc. 17) is DENIED.

Dated at Rutland, in the District of Vermont, this 31 day of May, 2017.

Geoffrey W. Crawford, Judge
United States District Court